UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEWARD HEALTH CARE SYSTEM LLC, et al., <br><br> Plaintiffs <br><br> v. <br><br> BLUE CROSS & BLUE SHIELD OF RHODE ISLAND, <br><br> Defendant. | Misc. No. _____ <br><br> (D.R.I. Case No. 13-405S) |

**BLUE CROSS & BLUE SHIELD OF RHODE ISLAND'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION BY THIRD PARTY <u>NEMZOFF & COMPANY, LLC</u>**

Blue Cross & Blue Shield of Rhode Island ("BCBSRI") hereby submits this Memorandum of Law in support of its Motion to Compel Production by Third Party Nemzoff & Company, LLC ("Nemzoff").

This Court should issue an order compelling Nemzoff to produce documents in response to BCBSRI's Subpoena *Duces Tecum* (attached as Exhibit A to the Declaration of Leslie D. Parker (the "Parker Decl.")) (the "Subpoena") in accordance with Fed. R. Civ. P. 45. The Subpoena, which was served on Nemzoff on or around July 2, 2015, commanded Nemzoff to produce documents by July 30, 2015. *See* Parker Decl. ¶ 2, Ex. A, Ex. B. As of December 18, 2015 – over five months after being served with the Subpoena – Nemzoff has not produced a single document in response to the Subpoena, nor has it served written objections as required by Fed. R. Civ. P. 45.

The requested documents are relevant – and critically important – to the underlying case. Nemzoff, which is "widely regarded as the leading expert in the country in the hospital M&A

field," was the "central figure in the sale" of Landmark Hospital, as well as the "Project Director" and "Lead Negotiator" on Steward Health Care System, LLC's ("Steward") bids for the acquisition of that hospital. *See* Parker Decl. ¶ 14, Ex. M. Thus, as set forth further herein, Nemzoff's documents will contain highly relevant information in the underlying antitrust and tort case that revolves around the sale of Landmark and Steward's bids for the acquisition of that hospital. Moreover, despite BCBSRI's repeated good faith and reasonable efforts to avoid imposing an undue burden or expense on Nemzoff – such as proposing search terms and providing a list of specific relevant events and topics as it requested – Nemzoff has refused to meaningfully participate or cooperate in response to the Subpoena. Instead, Nemzoff is unreasonably and inappropriately refusing to produce the requested documents unless BCBSRI agrees to pay at least $100,000-$125,000 – ostensibly to reimburse Nemzoff for its attorneys' collection, privilege and relevancy review, and production of the requested documents. In response to BCBRSI's recent good faith request that it provide a cost estimate excluding attorney time for collection, review and production, Nemzoff *increased* this demand to $550,000 for that process if it is performed by Nemzoff itself.

Nemzoff made these demands having neither run BCBSRI's proposed set of search terms to estimate the volume of potentially responsive documents, nor having proposed *any* revisions to BCBSRI's search terms, nor having conducted its own search for responsive documents, nor having produced a *single* document as commanded by the Subpoena.

Enough is enough. Because such costs are unreasonable and Nemzoff's documents are squarely relevant to this case, an order compelling production pursuant to the Subpoena is warranted.

## BACKGROUND

**The Underlying Case**

In the antitrust and tort case pending in the United States District Court for the District of Rhode Island, *Steward Health Care System LLC, et al. v. Blue Cross & Blue Shield of Rhode Island*, C.A. No. 13-405S (the "Rhode Island Litigation"), Steward Health Care System, LLC ("Steward") claims that it sought to acquire Landmark Hospital in order to then create a network of community hospitals in Rhode Island. Steward contends that BCBSRI saw Steward as a competitive threat, and claims BCBSRI therefore engaged in anticompetitive conduct to frustrate Steward's purchase of Landmark. But BCBSRI did nothing improper to interfere with Steward's potential acquisition of Landmark. Far from refusing to deal with Steward on rates at Landmark, BCBSRI negotiated in good faith and offered reasonable *increased* reimbursement rates that Steward nevertheless refused. Moreover, BCBSRI is confident that discovery, including documents in the possession of Nemzoff, will reveal that Steward abandoned its plans to purchase Landmark for reasons other than BCBSRI's rate proposal, and now seeks to blame BCBSRI for its own business decision.

**Nemzoff's Central Involvement in the Central Events**

At the time that Steward was negotiating to acquire Landmark, Landmark was operated by a Special Master appointed by the Rhode Island Superior Court for Providence County. To find a strategic partner to operate and eventually purchase Landmark, the Special Master engaged Nemzoff to attract and deal with potential buyers. According to Nemzoff, it was "a central figure in the sale of this hospital" and was the "Project Director" and "Lead Negotiator" on the Steward bids and handled "all negotiations on [the Steward] deal." *See* Parker Decl. ¶ 13, Ex. K. Thus, Nemzoff was involved in most, if not all, aspects of Steward's potential acquisition

3

of Landmark.  Such matters include, but are not limited to: Steward's supposed plan to create a network of hospitals in Rhode Island; Steward's negotiations with the Special Master for the purchase of Landmark (including express conditions precedent to Steward's obligation to purchase Landmark – unfulfilled conditions entirely unrelated to BCBSRI); Steward's rate negotiations with BCBSRI; and Steward's ultimate decision not to purchase Landmark.  Nemzoff was also involved with other prospective bidders for Landmark, communications and dealings that are relevant to both alleged causation and claimed damages in this case.  As a result of Nemzoff's significant involvement in the central events and transactions underlying this case, its documents and emails created in its role as consultant to the Special Master are squarely relevant to this case.

**BCBSRI's Subpoena and Nemzoff's Unreasonable Refusal to Produce Documents**

Due to its central involvement, BCBSRI served the Subpoena on Nemzoff on or about July 2, 2015, which commanded Nemzoff to produce documents by July 30, 2015.  *See* Parker Decl. at ¶ 2, Exs. A, B.  After receiving that subpoena, Nemzoff's counsel indicated that there was a terabyte of data that would be involved in responding to the Subpoena and it would cost "tens of thousands of dollars" to review and produce.  *See* Parker Decl. ¶ 3.

In a good faith and reasonable effort to avoid imposing an undue burden or expense on Nemzoff, BCBSRI counsel discussed the possibility of using search terms and agreed to send Nemzoff's counsel proposed terms.  *See id.*  After BCBSRI sent those search terms to Nemzoff, Nemzoff responded that they were unacceptable because they were too burdensome; however, Nemzoff did not suggest any revisions.  *See id.* ¶ 4, Ex. C.[1]

---

[1]     In that email, Nemzoff stated that the term "'Steward' would not be helpful given what it would likely generate."  *See* Parker Decl. ¶ 4, Ex. C.  That statement, however, ignores that the term "Steward" was not a standalone term—it was limited by multiple other terms relating to Landmark or BCBSRI.  *See id.*  Moreover, although its email asserted that the "subpoena is

In another effort to resolve the dispute and avoid imposing an undue burden or expense on Nemzoff, BCBSRI asked Nemzoff to send a report of documents that hit on the search terms so that BCBSRI could meaningfully evaluate Nemzoff's burden objection. *See id.* ¶ 5, Ex. D. Nemzoff, however, refused to provide any further explanation of the burden associated with the terms. *See id.* Months later, Nemzoff claimed that it searched for the stand-alone term "Blue Cross" and found 23 GB of data. *See id.* ¶ 10, Ex. I. BCBSRI's counsel explained that just searching for "Blue Cross" would not provide an accurate sample, because "Blue Cross" was not a stand-alone term but was limited by other terms. In other words, the search terms would only capture a document if it contained the term "Blue Cross" **_and_** another search term. *See id.* In response, Nemzoff claimed that when the term "Blue Cross" was coupled with the other limiting terms the amount of data increased. *See id.* Such a result, however, is impossible: the search term string ""Blue Cross" **_and_** a [second term]" will never include *more* documents than the stand-alone search for "Blue Cross" because, by definition, the first search term string will only include documents that contain the term "Blue Cross." Indeed, the entire point of proposing limited terms was to minimize the potential for undue burden by reducing the number of potentially responsive documents that contained just the term "Blue Cross."

In a further attempt to engage Nemzoff in a discussion regarding the Subpoena and in response to a suggestion from Nemzoff, BCBSRI sent Nemzoff a letter outlining a comprehensive list of topics and events about which it sought documents. *See id.* ¶ 6, Ex. E. In response to that letter, Nemzoff demanded that BCBSRI agree to pay $100,000 to $125,000 (or potentially more) for its production and refused to provide any further explanation for this figure,

---

overbroad and unduly burdensome," Nemzoff never served written objections to the Subpoena as required by Fed. R. Civ. P. 45(B).

such as any information regarding the specific amount of data responsive to these topics. *See id.* ¶¶ 7-8, Exs. F, G.

Nemzoff also continued to refuse to work with BCBSRI on the search terms or topics. *See id.* at ¶ 8, Ex. G. It disclosed only that Nemzoff uses Gmail to store apparently a terabyte of emails and does not keep its emails in any folders. *See id.* at ¶ 9, Ex. H. Additionally, Nemzoff explained that it has only one staff person and, as a result, it required 200 hours of attorney time to "search, organize, and then produce the material."[2] *See id.* BCBSRI responded that using attorneys for 200 hours of searching, organization, and production of an unknown quantity of emails was an unreasonable demand. *See id.* ¶ 10, Ex. I. It also again inquired if there were particular terms with which Nemzoff was concerned. *See id.* Rather than meaningfully responding to that email, Nemzoff cut off the lines of communication between the parties and made *ad hominem* attacks on BCBSRI counsel. *See id.* ¶ 11, Ex. J.

Despite Nemzoff's refusal to meaningfully cooperate in response to the Subpoena or to even communicate with certain BCBSRI counsel, BCBSRI made a final attempt to engage Nemzoff in a discussion to receive the responsive documents or limit the search terms.[3] *See id.* ¶ 12, Ex. K. In that letter, BCBSRI outlined the discussions between the parties and the reasons why Nemzoff's demand that BCBSRI pay it at least $100,000 to $125,000 was unreasonable. Therein, BCBSRI also requested that Nemzoff (1) agree to provide the responsive documents

---

[2] A protective order already entered in the case, which applies to third-party productions, provides for confidentiality designations, and contains non-waiver and clawback provisions. *Id.* at ¶ 12, Ex. J.

[3] In his October 21, 2015 correspondence, Nemzoff's counsel refused to respond to any more emails from the BCBSRI counsel who was handling the Subpoena and stated that he would only respond to emails from "the partner in charge of this matter at [BCBSRI counsel's] firm." *See* Parker Decl. ¶ 11, Ex. J. Although Nemzoff counsel's request to dictate the lines of communication was unreasonable, unwarranted, and inappropriate, the December 7, 2015 BCBSRI letter was signed by both the BCBSRI lawyer who was handling the Subpoena and the "partner in charge of this matter at [BCBSRI counsel's] firm" in a good faith and reasonable effort to work with Nemzoff on its response to the Subpoena. *See id.* ¶¶ 11-12, Exs. J, K.

that it has requested; (2) provide revised search terms; or (3) provide a cost estimate that excludes attorney time for the collection and production of the documents, attorney privilege review, and attorney relevance review.  *See id.*  BCBSRI explained that, should Nemzoff continue to refuse to produce documents, send revised search terms, and/or provide a reasonable and efficient cost estimate by December 11, 2015, it would move to compel the production of documents pursuant to the Subpoena.  *See id.*

On December 11, 2015, Nemzoff responded to BCBSRI but refused to provide a reasonable and efficient cost estimate, revised search terms, or an agreement to produce the documents.  *See id.* ¶ 13, Ex. L.  Nemzoff, instead, continued to demand at least $100,000-$125,000 for attorney collection, privilege and relevancy review, and production (ostensibly for over 200 hours of attorney time at an approximately rate of $500/hour).  *See id.* ¶ 9, Ex. H.  It also provided a purported alternative option in which BCBSRI would pay $550,000 for Nemzoff to produce the documents, conduct a privilege and relevancy review, and produce the documents.  *See id.* ¶ 13, Ex. L.  In that proposal, Nemzoff would collect and review for privilege and relevancy every email.  *See id.*  It estimates that it would take "an average of 10 minutes to locate, read and paginate each email, taking over 800 hours to do so" and that "Nemzoff currently bills its time at a rate of $650 an hour."  *See id.*  In other words, in response to BCBSRI's final good faith attempt to engage Nezmoff in a cost-effective solution, Nezmoff's new demand to comply with the Subpoena was five times greater.

## **ARGUMENT**

This Court should order Nemzoff to comply fully and completely with BCBSRI's Subpoena.  The requested documents are centrally relevant – and critically important – to the underlying case.  Nemzoff has refused to participate in BCBSRI's repeated good faith attempts

to engage in cost-effective, meaningful discovery. Nemzoff's refusal to produce documents that are central to this lawsuit commanded by the Subpoena unless BCBSRI agrees to pay at least $100,000-$125,000 for its attorney collection, review, and production of documents or $550,000 for its own review is unwarranted and unreasonable.

### A. **<u>Nemzoff's Documents Are Centrally Relevant and Critically Important to this Case.</u>**

This Court should require Nemzoff to produce the responsive documents immediately because the documents and emails created in Nemzoff's role as consultant to the Special Master are centrally relevant and critically important to this case and proportional to the needs of the claims and defenses in the Rhode Island litigation. Nemzoff agrees that it played a centrally relevant role in the transaction and negotiations underlying this case. Specifically, Nemzoff's counsel explained:

> Although you have correctly indicated my client is indeed a central figure in the sale of this hospital, Nemzoff was the Project Director and lead negotiator on the bid process after Steward first terminated their bid. Nemzoff was also in charge of all negotiations with the subsequent bidders, none of whom were selected. Later, Nemzoff was the Project Director and Lead Negotiator on the second Steward bid, and handled all negotiations on that deal while reporting directly to the Special Master. Finally, Nemzoff was the project Director and Lead Negotiator on behalf of Prime, who, ultimately, was the winning bidder.

Parker Decl. ¶ 13, Ex. L. Indeed, as confirmed by Nemzoff's counsel, Nemzoff was involved in Steward's negotiations to acquire Landmark, Steward's alleged plan to create a potential network of hospitals in Rhode Island, Steward's negotiations with other entities to fulfill conditions precedent to acquisition of Landmark, Steward's negotiations with BCBSRI, and Steward's decision to abandon its potential purchase of Landmark. Nemzoff's communications with the Special Master concerning Steward, its negotiations, its bid, and the viability of Landmark are also squarely relevant. Moreover, Nemzoff's documents and emails regarding other Landmark bidders are relevant to both the causation and damages aspects of this case.

**B. Nemzoff Has Refused to Participate in BCBSRI's Attempts to Engage in Cost-Effective, Meaningful Discovery.**

An order compelling Nemzoff to produce the responsive documents is warranted because Nemzoff has refused to participate in BCBSRI's attempts to engage in cost-effective, meaningful discovery. "[T]ransparency and collaboration is essential to meaningful, cost-effective discovery." *Apple, Inc. v. Samsung Elec. Co. Ltd.*, No. 12-CV-0630, LHK (PSG), 2013 WL 1942163, at *3 (N.D. Cal. May 9, 2013). Thus, a third party's "attempt to stand outside of these tenets because of its third party status is unpersuasive." *Id.* As the *Apple* court determined: "Although [a third-party] should not be required to 'subsidize' litigation to which it is not a party, it confuses undue burden with its obligations, once subject to a subpoena, to participate in transparent and collaborative discovery. Third-party status does not confer a right to obfuscation or obstinacy." *Id.*

Despite BCBSRI's repeated good faith and reasonable efforts to avoid imposing an undue burden or expense on Nemzoff, Nemzoff has refused to participate, collaborate, or cooperate as to its response to the Subpoena in any meaningful manner. For example, BCBSRI:

- Proposed search terms and repeatedly invited Nemzoff to suggest revisions to those terms;

- Provided, at Nezmoff's request, a comprehensive list of topics and/or events about which BCBSRI sought documents, including specific date ranges where possible;

- Provided Nemzoff for its review a copy of the Protective Order in the Rhode Island Litigation to address concerns about confidentiality and/or privilege;

- Invited Nemzoff to propose specific privilege search terms to run against the initial set of potentially relevant documents in order to identify reasonably and efficiently any potentially privileged documents;

9

- Invited Nemzoff to provide a reasonable and efficient costs estimate for production.

In response to BCBSRI's good faith and reasonable efforts to avoid imposing on Nemzoff an undue burden or expense, Nemzoff has, instead, attempted to avoid its obligations under the Subpoena by making unreasonable demands on BCBSRI.  For example, Nemzoff has:

- Refused to run the set of search terms;

- Refused to provide any report regarding the documents that hit on these terms;

- Refused to provide any revisions to the search terms;

- Refused to consider the list of events and topics that Nemzoff requested and BCBSRI provided by proposing any revisions thereto;

- Refused to consider a cost-effective manner of reviewing and producing documents;

- Attempted to cut off the lines of communication with BCBSRI after making ad hominem attacks on BCBSRI's counsel; and

- Refused to provide a reasonable and efficient cost estimate for production and recently increased its demand by a magnitude of five after BCBSRI recently again asked for an efficient and reasonable cost estimate.

The Court should not permit Nemzoff to use obfuscation and obstinacy to avoid complying with its discovery obligations.[4]

### C. Nemzoff's Demand that BCBSRI Pay at Least $100,000 to $125,000 or $550,000 Is Inefficient, Unreasonable, and Unwarranted.

As a threshold matter, Nemzoff's refusal to produce documents unless and until BCBSRI agrees to pay at least $100,000-$125,000 or $550,000 is not based on the estimated volume of

---

[4] In the Rhode Island Litigation, BCBSRI has served subpoenas on eight parties.  Steward has served fourteen subpoenas.  Other than Nemzoff and one other third-party from whom BCBSRI is still seeking documents, all of the parties subpoenaed by BCBSRI have provided responsive documents.  In some cases, production occurred after good faith communications to ensure cost-effective meaningful discovery.

potentially responsive documents derived from BCBSRI's proposed set of search terms because Nemzoff has not run BCBSRI's set of search terms. Nemzoff's demands are unreasonable on this basis alone.

Furthermore, Nemzoff's demands are unwarranted and unreasonable due to its insistence that BCBSRI pay (1) for attorney or consultant time to perform the collection and production work and (2) that BCBSRI subsidize its privilege and relevancy review. Non-parties cannot demand costs for an inefficient and unreasonable review process. *See, e.g.*, *U.S. v. McGraw-Hill Cos., Inc.*, 302 F.R.D. 532, 536 (C.D. Cal. 2014) ("In other words, Rule 45 does not cut a blank check to non-parties—unnecessary or unduly expensive services do not 'result from compliance' and, therefore, do not count as 'expenses.'"); *In re Am. Housing Found.*, No. 09-20232, 2013 WL 2422706, at *2 (N.D. Tex. June 4, 2013) ("To the extent a third party merely chooses to have an attorney review all aspects of its compliance . . . it does so for its own benefit. Fees for services that benefit the non-party are not reimbursable."); *Phillip M. Adams & Assocs., LLC v. Fujitsu Ltd.*, No. 1:05-CV-64 TS, 2010 WL 1064429, at *4 (D. Utah Mar. 18, 2010) (stating that the non-parties must "use the most efficient method for completing production. Attorneys should not do the work that can just as easily be done by a legal assistant, or clerical workers supervised by a legal assistant").

Here, Nemzoff's demand that BCBSRI pay for its attorneys or its consultant to organize, review, and produce its disorganized documents is both inefficient and unreasonable. Specifically, Nemzoff is demanding that BCBSRI pay for attorney or consultant time for the collection and production of documents. Nemzoff claims that attorney time is necessary for these tasks because Nemzoff is a small company with only one assistant and its documents are "disorganized." BCBSRI should not be required to pay fees due to Nemzoff's failure to store its

documents in a reasonable manner. Likewise, BCBSRI should not bear the burden of paying for this inefficient collection, review, and production process because Nemzoff prefers to use attorney or consultant time, rather than vendor or assistant time, for its collection and production. Thus, Nemzoff's proposal that BCBSRI pay at least $100,000-$125,000 for attorneys or $550,000 for its consultant, rather than a vendor, an assistant, or other personnel, to conduct the collection and production is inefficient, unreasonable, and unwarranted.

More importantly, Nemzoff's demand that BCBSRI pay $100,000-$125,000 (or more) or $550,000 is unreasonable because it requires BCBSRI to subsidize Nemzoff's privilege and relevancy review. To the extent that any cost-shifting is even potentially warranted, that cost-shifting should only include fees where the work benefits the requesting party. *See Lefta Assocs. v. Hurley*, No. 1:09-cv-2487, 2011 WL 1793265, at *4 (M.D. Pa. May 11, 2011); *see also In re Petition of Frescati Shipping Co.*, No. 05-305, 2006 WL 3544270, at *1 (E.D. Pa. Dec. 6, 2006) (noting that a third-party "may recover expenses resulting from the production, including legal fees where the word benefits the requesting party" and awarding half of the fees sought because the fees benefited both the third party and the requesting party); *In re Automotive Refinishing Paint*, 229 F.R.D. 482, 496 (E.D. Pa. 2005) (stating that a non-party's legal fees may be reimbursable when the work benefits the requesting party). Thus, a non-party cannot shift costs for a privilege and responsiveness review to a third party because that work is performed solely for the benefit of the non-party. *See, e.g.*, *Lefta*, 2011 WL 1793265, at *4 (denying a request for attorney fees for a privilege review because the work was performed solely for the non-party's benefit); *Bell Inc. v. GE Lighting, LLC*, No. 6:14-CV-00012, 2014 WL 1630754, at *12 (W.D. Va. Apr. 23, 2014) (denying a request for attorneys fees spent on reviewing individual documents generated by search parameters for relevance privilege and protected materials).

Furthermore, when a protective order with a claw back provision is entered in a case, it is particularly "untenable for a party to insist on individually reviewing all documents for privilege and responsiveness." *Bell*, 2014 WL 1630754, at *12, *15; *see also Behrend v. Comcast Corp.*, 248 F.R.D. 84, 87 (D. Mass. 2008) (granting a motion to compel a third party's production and suggesting that a party take advantage of a clawback agreement to reduce the costs of compliance).

For example, in *Lefta*, the United States District Court for the Middle District of Pennsylvania declined to require a requesting party to pay a non-party's attorneys fees associated with responding to a subpoena. *See Lefta*, 2011 WL 1793265, at *4. That requested cost-shifting was unwarranted because the non-party "had not shown that these legal fees [were] directly related to work which benefitted the requesting party." *See Lefta*, 2011 WL 1793265, at *4. Those fees, instead, "appear[ed] largely related to efforts by the bank to protect its own interests in connection with its compliance with the subpoena by independently reviewing these documents itself to determine claims of privilege it might assert." *Id.* Thus, that privilege review "was done at the bank's instance to protect the bank's legal rights in connection with this compelled production" rather than to benefit the requesting party. *See id.*

Similarly, in this case, Nemzoff's refusal to produce documents unless and until BCBSRI agrees to pay at least $100,000-$125,000 or $550,000 is inappropriate because Nemzoff is demanding that BCBSRI pay for Nemzoff's attorney or consultant review for privilege and relevancy, which benefits Nemzoff, rather than BCBSRI. As BCBSRI explained to Nemzoff, a protective order already entered in the case, which applies to third-party productions, provides for confidentiality designations, and contains non-waiver and clawback provisions. *Id.* at ¶ 12, Ex. J. Moreover, after providing Nemzoff a copy of the protective order, and in an attempt to

address any additional privilege concerns, BCBSRI invited Nemzoff to propose privilege search terms which Nemzoff could run against the initial set of potentially relevant documents, identified from the original search terms, in order to identify reasonably and efficiently any potentially privileged documents. *See* Parker Decl. ¶ 13, Ex. L. To be clear, of course Nemzoff can review some or all of its documents prior to production (nor is BCBSRI seeking for Nemzoff to produce privileged documents). But it cannot force BCBSRI to subsidize that review where, as here, it has rejected BCBSRI's reasonable cost-effective proposals and, thus, the review is done solely for Nemzoff's benefit.

## CONCLUSION

For the foregoing reasons, BCBSRI respectfully requests that this Court enter an order requiring Nemzoff to produce documents responsive to the Subpoena.

DATED: December 18, 2015

BLUE CROSS & BLUE SHIELD
OF RHODE ISLAND
By its attorneys,

Daniel S. Metroka (Pa. No. 206040)
Hogan Lovells US LLP
1835 Market Street, 29th Fl.
Philadelphia, PA 19103
Daniel.metroka@hoganlovells.com
Tel: (267) 675-4662
Fax: (267) 675-4601

OF COUNSEL:

John Tarantino, Esq.
Patricia K. Rocha, Esq.
Joseph Avanzato, Esq.
Leslie D. Parker, Esq.
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607

jtarantino@apslaw.com
procha@apslaw.com
javanzato@apslaw.com
lparker@apslaw.com

N. Thomas Connally, III, Esq.
Emily M. Yinger, Esq.
Hogan Lovells US LLP
Park Place II, Ninth Floor
7930 Jones Branch Drive
McLean, VA  22102-3302
Tel:  703-610-6100
Fax:  703-610-6200
tom.connally@hoganlovells.com
emily.yinger@hoganlovells.com

Robert F. Leibenluft, Esq.
Justin W. Bernick, Esq.
Hogan Lovells US LLP
555 13th Street NW
Washington, DC 20004
Tel:  202-637-5600
Fax:  202-637-5910
robert.leibenluft@hoganlovells.com
justin.bernick@hoganlovells.com