IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEWARD HEALTH CARE SYSTEM LLC, et al., : | MISCELLANEOUS |
| Plaintiffs, : | |
| v. : | No.  15-272 |
| BLUE CROSS & BLUE SHIELD OF RHODE ISLAND, : | |
| Defendant. : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                   **NOVEMBER 4, 2016**

Presently before the Court are the briefs submitted by both Blue Cross & Blue Shield of Rhode Island ("BCBSRI") and Nemzoff & Company, LLC ("Nemzoff") (Doc. Nos. 1, 6, 9) and the correspondence addressed to this Court by Nemzoff and BCBSRI (Doc. Nos. 26, 27, 29, 30, 32, 33, 39, 40) addressing Nemzoff's request for cost-shifting.  For the reasons set forth below, Nemzoff's request for cost-shifting is granted in part and denied in part.

**I.      BACKGROUND**

The sole issue to be decided before this Court in this matter is the request for cost-shifting by Nemzoff in response to a third-party subpoena issued by BCBSRI.  Nemzoff's refusal to comply with the Subpoena led to over a ten month delay in the production of the documents.  The delay was almost entirely based on the issue of whom should bear the costs of production.  The dispute largely focused on the issue of attorneys' fees for a privilege and confidentiality review that Nemzoff felt BCBSRI should be held financially responsible.  However, Nemzoff has failed to adequately show that a large majority of the expenses that it requested to be

reimbursed for were a result of compliance with the subpoena; therefore, it will only be awarded a portion of its requested expenses.

The underlying case is an antitrust and tort case pending in the United States District Court for the District of Rhode Island, <u>Steward Health Care System LLC, et al. v. Blue Cross & Blue Shield of Rhode Island</u>, C.A. No. 13-405S (the "Rhode Island Litigation"). Steward Health Care System, LLC ("Steward") alleges that it sought to acquire Landmark Hospital ("Lankmark") in order to then create a network of community hospitals in Rhode Island. (BCBSRI's Mot. to Compel at 3.) Steward contends that BCBSRI saw Steward as a competitive threat, and claims BCBSRI engaged in anticompetitive conduct to frustrate Steward's purchase of Landmark. (<u>Id.</u>)

BCBSRI alleges that Nemzoff, although not a party to the underlying case, was critically involved in the central events. (<u>Id.</u> at 3-4.) BCBSRI states that, at the time that Steward was negotiating to acquire Landmark, Landmark was operated by a Special Master appointed by the Rhode Island Superior Court for Providence County. (<u>Id.</u> at 3.) To find a strategic partner to operate and eventually purchase Landmark, the Special Master engaged Nemzoff to attract and deal with potential buyers. (<u>Id.</u>) BCBSRI alleges that due to this significant involvement, the documents and emails that Nemzoff created in its role as consultant to the Special Master were relevant to the underlying case. (<u>Id.</u> at 4.) As a result, BCBSRI served a third-party subpoena ("Subpoena") on Nemzoff on or about July 2, 2015, which commanded Nemzoff to produce documents by July 30, 2015.

Nemzoff never refused to produce documents in accordance with the Subpoena because of relevancy. (Nemzoff's Opp. to Mot. to Compel at 3.) Rather, Nemzoff objected alleging that compliance with the Subpoena as written would result in it incurring an undue burden and

2

significant expense. (Id. at 1-4.) Essentially, Nemzoff demanded that in order for it to comply with the Subpoena, BCBSRI would have to agree to reimburse Nemzoff somewhere in between $125,000 and $500,000. (Id. at 3.)

This high figure was due in large part to two main reasons: the Gmail account that Nemzoff stored all of its documents on had a tremendous amount of data, but limited search capabilities, and Nemzoff wanted its attorneys to review the documents for privileged and confidential information. Even though BCBSRI offered search terms, Gmail's limited search function could not efficiently limit the nearly terabyte of data. (Id.) Due to the Gmail account's inefficiencies, Nemzoff thought it was best that, in order to identify responsive documents, an e-discovery vendor should download and preserve all of the data from the Gmail account to run search terms and process the responsive data. (Id. at 8.) Nemzoff provided an estimate from an e-discovery vendor for $90,000. (Id.) Notably, this cost did not include the cost of the privilege and confidential review by Nemzoff's attorneys. (Id. at 10-11.)

We had several telephone conferences with the parties in an attempt to resolve this cost-shifting issue by agreement. During a phone conference on April 1, 2016, we were advised that Nemzoff was provided with specific email addresses that BCBSRI wanted documents pertaining to, which enabled Nemzoff to reduce its terabyte of data in its Gmail account down to around 30,000 emails. Nemzoff still needed a vendor to collect and process the remaining 30,000 emails. We advised both parties to receive estimates from e-discovery vendors for these services. Nemzoff provided estimates from two different vendors: one for between $4,350–$8,850, and another one for $15,500. (Doc. No. 26.) BCBSRI's vendor estimated that the cost to do such services would be $3,150. (Doc. No. 27.) The biggest obstacle in coming to a resolution remained Nemzoff's demand for at least $20,400 in attorneys' fees to review its

documents for relevance, privilege, and confidentiality. (Id.) BCBSRI did not feel that Nemzoff was entitled to any attorneys' fees for such review, but it did acknowledge that it should bear at least some of the direct costs involved in the production. (Id.)

Due to Nemzoff's refusal to comply with the Subpoena without a cost-shifting order, we granted BCBSRI's motion to compel, and Nemzoff was ordered to produce all responsive documents in accordance with the Subpoena. (Doc. No. 28.) We did not consider the issue of cost-shifting at that time.[1] Rather, we advised Nemzoff "to respond to the subpoena by the most reasonable and practical method it can procure. In incurring expenses, it must do so with the mindset that it is spending its own money and that there might not be an apportionment of expenses." (Id.)

Once the production was complete and Nemzoff submitted its final costs, disputes between it and BCBSRI continued. Nemzoff stated that it had incurred $8,900 in vendor costs, $19,925 in attorneys' fees and $1,778.55 in "additional costs" in response to the Subpoena. (Doc. No. 29.) Notably, Nemzoff chose its own e-discovery vendor and did not even contact the vendor offered by BCBSRI. (Doc. No. 33.) BCBSRI requested that Nemzoff provide supporting documentation for their vendor and additional costs. (Doc. No. 30.) On September 7, 2016, we ordered Nemzoff to provide the Court with a more detailed statement in support of its claim for vendor and additional costs. (Doc. No. 31.) In response, Nemzoff provided an invoice breakdown of its vendor's email project, and also broke down the additional costs into line items such as telephone charges, Westlaw research, postal charges, court filings, messenger services, Pacer, travel expenses, secretarial overtimes, and professional services. (Doc. No. 32.) BCBSRI

---

[1] "The court is not required to fix the costs in advance of production, although this will often be the most satisfactory accommodation to protect the party seeking discovery from excessive costs. In some instances, it may be preferable to leave uncertain costs to be determined after the materials have been produced, provided that the risk of uncertainty is fully disclosed to the discovering party." In re Letters Rogatory, 144 F.R.D. 272, 278 (E.D. Pa. 1992) (citing Fed. R. Civ. P. 45 advisory committee's note).

argues that it should not be required to pay any of the additional costs or attorneys' fees and requests that vendor costs be reduced due to the fact that Nemzoff choose a more expensive vendor than the one it had offered. (Doc. No. 33.) In order for us to reach a proper determination in this matter, we ordered Nemzoff to answer several questions. (Doc. No. 38.) Nemzoff provided answers, and BCBSRI responded by letter. (Doc. Nos. 39, 40.)

## II.     STANDARD OF REVIEW

Subpoena practice in federal court is governed by Federal Rule of Civil Procedure 45. Fed. R. Civ. P. 45. Under Rule 45, a party may serve a subpoena on a non-party. Id. However, if that non-party objects and if a court orders compliance with the subpoena, the court "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." Fed. R. Civ. P. 45(d)(2)(ii). "[T]he questions before the district court are whether the subpoena imposes expenses on the non-party, and whether those expenses are 'significant.'" G & E Real Estate, Inc. v. Avison Young–Wash., D.C., LLC, No. 14-418, 2016 WL 1258458, at *2 (D. D.C. Mar. 30, 2016) (citing Linder v. Calero–Portocarrero, 251 F.3d 178, 182 (D.C. Cir. 2001) (citations omitted)); see also Legal Voice v. Stormans Inc., 738 F.3d 1178, 1184 (9th Cir. 2013). If the expenses do result from compliance with the subpoena and "they are [significant], the court must protect the non-party by requiring the party seeking discovery to bear at least enough of the expense to render the remainder 'non-significant.'" Id. Rule 45 bestows "broad enforcement powers upon the court to ensure compliance with subpoenas, while avoiding unfair prejudice to persons who are the subject of a subpoena's commands." Lefta Assocs. v. Hurley, No. 09-2487, 2011 WL 1793265, at *2 (M.D. Pa. May 11, 2011). "[I]t is well settled that decisions on matters pertaining to subpoena compliance rest in the sound discretion

of the trial court and will not be disturbed absent a showing of an abuse of that discretion." Id. (citing R.J. Reynolds Tobacco v. Philip Morris Inc., 29 F. App'x 880, 881 (3d Cir. 2002)).

### III.  DISCUSSION

We are tasked with deciding whether Nemzoff is entitled to any cost-shifting under Rule 45 for the various expenses it says were a result of the Subpoena served upon it by BCBSRI. As stated above, a non-party ordered to comply with a subpoena must be protected from any "significant expense resulting from compliance" under Rule 45. Fed. R. Civ. P. 45(d)(2)(ii). "It is critical, therefore, that only expenses that result from, and therefore, are caused by, the order of compliance are potentially compensable." G & E, 2016 WL 1258458, at *3. "Simply because a non-party undertook certain tasks and incurred associated expenses in the aftermath of an order compelling compliance with a subpoena does not mean that those costs resulted from that order." Id.

This idea that not all expenses, but only "reasonable expenses" will be compensable under Rule 45 is a notion that has been adopted by numerous courts across the country. See, e.g., id.; In re Application of Michael Wilson & Partners, Ltd., for Judicial Assistance Pursuant to 28 U.S.C. 1782, 520 F. App'x 736, 739 (10th Cir. 2013) ("Although Rule 45(c)(2)(B)(ii) protects a nonparty subpoena respondent from 'significant expense,' expenses . . . must be reasonable.") (quoting United States v. Columbia Broadcasting Sys., Inc., 666 F.2d 364, 371 n. 9 (9th Cir. 1982))); In re Modern Plastics Corp., 536 B.R. 783, 788 (Bankr. W.D. Mich. 2015) (same); United States v. McGraw–Hill Companies, Inc., 302 F.R.D. 532, 536 (C.D. Cal. 2014) ("But, one thing is certain: an unreasonably incurred expense is not an expense 'resulting from compliance.'"); Miller v. Allstate Fire & Cas. Insurance Co., No. 07-260, 2009 WL 700142, at *5 (W.D. Pa. Mar. 17, 2009) (holding that non-party will be awarded "the fair and reasonable

costs of employee hours spent performing the necessary administrative tasks"); In re: Propulsid Products Liability Litigation, No. 1355, 2003 WL 22341310, at *2 (E.D. La. Sept. 3, 2003).

All of this information leads us into a two-part inquiry in determining whether to award Nemzoff's costs under Rule 45.  See Legal Voice, 738 F.3d at 1184.  First, we will determine whether Nemzoff's expenses are reasonable, i.e., did these expenses result from compliance with the Subpoena.  Nemzoff separated his expenses into three categories: attorneys' fees, vendor costs, and additional costs, and we will analyze each separately in Section A below.  Second, in Section B, we will determine whether the total fees that result from compliance are "significant expenses" and, therefore, warrant compensation under Rule 45.  Overall, we find that only a portion of the expenses are reasonable; however, these expenses are significant and are compensable under Rule 45.

### A.  Whether the Expenses Resulted from Compliance with the Subpoena

#### *1.  Attorneys' Fees*

Nemzoff seeks reimbursement for its attorneys' fees totaling $19,925.  Under Rule 45, attorneys' fees awards are not per se excluded, but have been traditionally reserved for two situations.  See Lefta, 2011 WL 1793265, at *4.  First, fees have been awarded as sanctions, but these are generally reserved for only the most egregious of circumstances, such as when a party has clearly breached Federal Rule of Civil Procedure 45(c)(1) for failing to take reasonable steps to avoid imposing an undue burden or expense on a non-party.  See, e.g., Anderson v. Government of Virgin Islands, 180 F.R.D. 284, 291–292 (D. Vi. 1998) (granting attorney fees for repeat violations of Rule 45).  Second, and most relevant to our case, "courts have held that '[a] nonparty's legal fees, especially where the work benefits the requesting party, have been considered a cost of compliance' and may be subject to reimbursement."  Lefta, 2011 WL

1793265, at *4 (quoting In re Automotive Refinishing Paint, 229 F.R.D. 482, 496 (E.D. Pa. 2005)).

Here, Nemzoff does not make any arguments regarding sanctions, and we find that it, as the movant, has failed to carry its burden of proving that these attorneys' fees related to work that benefited BCBSRI.  Nemzoff made it quite clear in its Motion for Protective Order that it needed its attorneys to review the documents for privileged and confidentiality information. (Nemzoff's Mot. Protective Order at 7-9.)  Nemzoff was highly concerned with both opening itself up to liability and protecting its confidentiality obligations with third parties.  (Id.)  Likely realizing the problems that this type of attorney review would cause for their cost-shifting arguments, Nemzoff attempted to allude that their attorney review would also benefit BCBSRI. (Id. at 10-11.)  Essentially, Nemzoff argued that by having an attorney review the documents, BCBSRI would receive a tailored production that was free from unwanted and irrelevant documents, i.e., BCBSRI would not receive a "document dump."  (Id.; Doc. No. 39.)

Nemzoff's arguments fail for a couple reasons.  First, BCBSRI never requested that Nemzoff perform a relevance review. (Doc. No. 40.)  Nemzoff is attempting to confer an unwanted benefit upon BCBSRI.  It is BCBSRI's decision if it wants to spend additional time in reviewing what Nemzoff would consider a "document dump."  In reality, this argument also does not make much sense since BCBSRI would likely want their own attorneys reviewing and extracting the non-responsive documents rather than paying Nemzoff's attorneys to do so. Second, BCBSRI actually provided Nemzoff with ways to limit the responsive documents by providing numerous search terms and domain names.  BCBSRI made it quite clear from the beginning, and well before Nemzoff incurred any legal fees, that it wanted to limit the documents by search terms and did not want any sort of attorney review performed.  (BCBSRI's

Resp. in Opp. to Protective Order at 3-4)  Lastly, there are no statements from Nemzoff regarding the actual results of the review, i.e., whether any documents were in fact non-responsive.  Without this information, there is even more doubt that this review actually benefited BCBSRI.

It is clear from the facts, despite what it has alleged, that Nemzoff attorneys' fees were incurred as a result of its own desire to check for privileged and confidential documents.  These types of attorneys' fees are not subject to reimbursement under Rule 45, as explained by the Court in Lefta:

> we cannot find at this time that the bank, as movant, has carried its burden of showing that this is an instance in which '[a] nonparty's legal fees, especially where the work benefits the requesting party, [are properly] considered a cost of compliance' subject to reimbursement.  In re Automotive, 229 F.R.D. at 496.  Simply put, the bank has not shown that these legal fees directly related to work which benefitted the requesting party.  Quite the contrary, these fees appear largely related to efforts by the bank to protect its own interests in connection with its compliance with the subpoena, by independently reviewing these documents itself to determine claims of privilege it might assert. Indeed, in this setting, where the bank concedes that this attorney time was spent in large measure on a privilege review by the bank, it seems that the review was done at the bank's instance to protect the bank's legal rights in connection with this compelled production.

2011 WL 1793265, at *4 (citations omitted).  Other courts have come to similar conclusions.  See McGraw, 302 F.R.D. at 536 ("[T]he Court is skeptical that services provided by an attorney to a non-party for the non-party's sole benefit and peace of mind can be counted as expenses.") (internal citations and quotations omitted); G & E, 2016 WL 1258458, at *6 (finding that the third party's attorneys' fees for its laborious document review process were not compensable).

Additionally, Nemzoff fails to cite to any cases where the court awarded attorneys' fees under circumstances akin to the ones before us today.  In fact, the cases that Nemzoff relies on

9

that addressed cost-shifting come to the opposite conclusion.  See US Bank National Association v. PHL Variable Insurance Company, No. 12-6811, 2012 WL 5395249, at *3 (S.D. N.Y. Nov. 5, 2012) (awarding search, collection, and production costs associated with compliance, but holding that the "non-parties shall bear their own costs of reviewing the documents for privilege," and noting that "[g]enerally, it is not appropriate to shift such costs because the producing party has the exclusive ability to control the cost of reviewing the documents") (internal citation and quotation omitted); Miller, 2009 WL 700142, at *5 (awarding some cost-shifting, but holding that "[s]uch costs do not include any attorney hours spent on this matter or on the production of documents"); Maximum Human Performance, LLC v. Sigma-Tau Healthscience, LLC, No. 12-6526, 2013 WL 4537790, at *4 (D. N.J. Aug. 27, 2013) (awarding one-third of vendor costs to harvest the electronically stored information, but denying the third party's request for cost-shifting for "its own counsel fees incurred in complying with the subpoena").

When we ordered it to produce the documents pursuant to the Subpoena, we cautioned Nemzoff that it should proceed like it's spending its own money.  (Doc. No. 28) ("In incurring expenses, it [Nemzoff] must do so with the mindset that it is spending its own money and that there might not be an apportionment of expenses.").  Thus, Nemzoff was well aware that it might bear the potential cost of its privilege and confidentiality review, but opted to perform it anyway. In any event, Nemzoff has failed to carry its burden of proving that its attorneys' fees related to work that benefited BCBSRI; therefore, these fees are not subject to reimbursement under Federal Rule of Civil Procedure 45.  See Lefta, 2011 WL 1793265, at *4.

### *2. Vendor Costs*

Next, Nemzoff seeks an award of $8,900 for its e-discovery vendor costs. BCBSRI argues that it should not be required to pay for these expenses since they are excessive as it had offered a less expensive vendor that Nemzoff failed to even contact. (Doc. No. 33.)

We find that only a portion of Nemzoff's vendor costs are reasonable costs that result from compliance with the Subpoena. BCBSRI offered a vendor to Nemzoff that estimated it would cost $3,150 to complete the e-discovery project, while Nemzoff offered estimates from two vendors, one for $4,350-$8,850 and one for $15,500. (Doc. Nos. 26, 27.) Despite this discrepancy in price, Nemzoff did not even contact the vendor offered by BCBSRI. (Doc. No. 33.) Instead, Nemzoff chose the vendor who initially had the highest estimate out of all of the vendors. We sought further clarification from Nemzoff regarding its decision to go with its own vendor. (Doc. No. 38.) Nemzoff stated that trust and confidence were of utmost importance to it due to the confidentiality agreements involved in the production. (Doc. No. 39.) Nemzoff indicated that it did not have any sustained relationship with the vendor offered by BCBSRI, but it has a twenty-three year relationship with the vendor that it ultimately chose. (Id.) Regarding the cost difference, Nemzoff stated that its experts believed that the report of BCBSRI's vendor was not complete and/or accurate, and that the cost of the vendor would be the same or exceed those of its vendor by the time the project was complete. (Id.)

We find that these excessive costs do not result from the compliance with the Subpoena. One reason for its decision to use its own vendor was due to the existence of a long-term relationship. If Nemzoff wants to choose a vendor based on a relationship of trust and confidence, it is free to do so, but it cannot expect BCBSRI to pay for the enhanced

11

costs. This extra security offered by its own vendor was not necessary for compliance and, in no way, benefited or affected BCBSRI. "Rule 45 does not cut a blank check to non-parties-unnecessary or unduly expensive services do not 'result from compliance' and, therefore, do not count as 'expenses.'" McGraw, 302 F.R.D. at 536. This service was unnecessary and excessive.

     BCBSRI was attempting to keep costs low as required under Rule 45. However, Nemzoff and its experts determined that BCBSRI's estimate was not complete or accurate. Nemzoff made this determination without contacting the vendor. To largely ignore the lower cost vendor offered by BCBSRI, Nemzoff placed an increased financial burden of themselves. Nemzoff has failed to explain in any way how the estimate was incomplete or inaccurate. At every stage, BCBSRI has attempted to collaborate with Nemzoff in an attempt to reduce the costs of its production. At first, BCBSRI provided numerous search terms to help limit the documents. Then, BCBSRI offered a less expensive vendor to perform the services it needed. BCBSRI has continually attempted to manage the e-discovery efficiently and with the least expense possible, and it should not be held responsible for the financial burden that Nemzoff placed on itself.

     In light of this analysis, we find that only a portion of Nemzoff's vendor costs are expenses resulting from compliance. We find that the expense in excess of BCBSRI's vendor's estimate was not a reasonable expense that resulted from compliance with the Subpoena. Nemzoff choose the vendor for its own benefit, and BCBSRI will not be responsible for this choice. We conclude that BCBSRI's vendor's estimate of $3,150 is an expense resulting from compliance with the Subpoena as it is a direct cost associated with the production. As discussed above, after we address the "Additional Costs," we will then

move on to the second stage of our analysis, and make a determination if the total expenses resulting from compliance are "significant" and, thus, compensable under Rule 45.

### 3. *Additional Costs*

Finally, Nemzoff wants reimbursement for its fees it simply labels as "Additional Costs." (Doc. No. 32.) The Additional Costs are broken down into line items and include: telephone charges, Westlaw research, postal charges, court filings, messenger services, Pacer, travel expenses, secretarial overtimes, and professional services. (See id.) The issue with these charges is that almost all of them lack any sort of detail that would enable us to properly determine whether or not these charges "result from compliance." With descriptions of the charges simply as "telephone charges" or "Westlaw, research," it is impossible for us to parse through them. We sought further clarification from Nemzoff regarding these charges, and it responded with the following statement:

> The Additional Costs were incurred by Nemzoff in an effort to limit the scope of the overly broad and unduly burdensome subpoena, and to comply with subpoena. Nemzoff's attorneys negotiated with opposing counsel in an effort to limit the scope of the subpoena, reviewed the documents extracted by the e-discovery vendor after the e-discovery vendor created the Gmail database, and coordinated with the e-discovery vendor by telephone and counsel for BCBSRI to confirm that BCBSRI had direct access to the Gmail database containing the documents that BCBSRI had subpoenaed. In addition, Nemzoff incurred costs involved in the consultation of an alternative outside vendor in an effort to provide a range of cost-estimates for the Court and opposing counsel.

(Doc. No. 39.) Since Nemzoff provided us again with more general statements regarding its additional costs, we are still not in a position to determine whether most of them resulted from compliance with the subpoena.

We will need to go through and address each group of charges separately. First, we will analyze the telephone charges. Every single one of the thirty-three telephone charges simply reads "telephone charges." Without a description of the phone call or even who the phone call was between, we cannot properly determine whether these phone calls were necessary to comply with the Subpoena. Nemzoff stated that it negotiated with opposing counsel and coordinated by vendor by telephone; however, without any further detail, we are left guessing what telephone charges correspond with what activity and parties. Since we cannot properly make this determination, we cannot subject these expenses to reimbursement. Similarly, the expense listed as "Secretarial Overtime" will not be subject to reimbursement because, without more, we are unable to determine how this was necessary for compliance with the subpoena.

Also, we will not award the expenses listed as "Westlaw, research." We asked Nemzoff specifically about these charges, but it did not address them in its response. (Doc. No. 39.) It is unclear why Nemzoff would need to perform any legal research in order to comply with the Subpoena.

Next, we will address the travel expenses. The travel expense totaling $14.41 for a round trip cab ride to court for the March 14, 2016 hearing is a reasonable expense that resulted from compliance with the Subpoena. Likewise, Ernest Badway's (counsel for Nemzoff) out of town travel expense totaling $233.00 for the same hearing is also an expense resulting from compliance. All of the remaining travel expenses are described as "Travel Expense: Ernest E. Badway" and the entries are dated May 4, 2016. We are unsure what these charges pertain to since all of the conferences after the March 14, 2016 hearing were held via telephone. Again, we gave Nemzoff a chance to explain these charges, but it failed to do so; consequently, we cannot properly determine that these remaining travel expenses were a result of compliance with the

14

Subpoena.  Therefore, we find that only a total of $247.41 of the requested travel expenses constitute expenses resulting from compliance

The next expense that we will address is "Professional Services – Pay To: Renaissance Associates, LTD."  Nemzoff states that this category relates to the "costs involved in the consultation of an alternative outside vendor in an effort to provide a range of cost-estimates for the Court and opposing counsel."  (Doc. No. 39.)  We instructed the parties to go out and retrieve estimates for e-discovery vendors in an attempt to alleviate the financial burden placed on Nemzoff.  Thus, the $601.88 payment to a vendor for a consultation is a reasonable expense that results from compliance with the Subpoena.

We find that the remaining expenses, which include: postal charges, Pacer charges, court filing fees, messenger services fees, and outside vendor copy fees, are expenses that result from compliance with the Subpoena.  These are the direct costs associated with the production and are reasonable and were completely necessary in order to properly comply.  These expenses are $73.36 in total.

### B.  Whether the Expenses are Significant

In sum we have concluded that $3,150 in vendor costs, $247.41 in travel expenses, $601.88 for a professional vendor consultation, and $73.36 in miscellaneous expenses constitute "expenses resulting from compliance" with BCBSRI's Subpoena, for a total expense of $4,072.65.  We must now determine whether these total expenses are "significant" for purposes of Rule 45.  See Legal Voice, 738 F.3d at 1184.  The parties in their briefs and letters focused their attention largely on the issues of attorneys' fees and vendor costs, and neither focused on what would constitute a "significant" expense for Nemzoff.  Neither the Federal Rules nor the United States Court of Appeals for the Third Circuit has defined the term "significant expenses."

For guidance, we are able to look to other decisions for benchmarks as to what expenses are "significant." See McGraw, 302 F.R.D. at 536. The facts that the Court dealt with in G & E are very similar to the facts before us in this matter. 2016 WL 1258458, at *7. The Court in that case was faced with the issue of whether $3,148.44 was a significant expense under Rule 45. See id. Like our case, the parties did not brief the issue. Relying on prior case-law, the Court held that the expenses totaling $3,148.44 were in fact significant. See id. Therefore, the court concluded that the non-party had to be protected from these expenses under Rule 45(d)(2)(ii). See id. We find no reason to come to an alternate conclusion in our case since our expenses are even higher than those in G & E. Accordingly, pursuant to Rule 45(d)(2)(ii), we award Nemzoff $4,072.65 in expenses.

IV.     **CONCLUSION**

In accordance with the above, Nemzoff's request for cost-shifting pursuant to Rule 45 is granted in part and denied in part. The request is granted insofar as we award Nemzoff expenses totaling $4,072.65. The request is otherwise denied.

An appropriate Order follows.